IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
DANVILLE DIVISION

| | | |
|---|---|---|
| MICHAEL ELDER, | ) | |
| | ) | |
| Plaintiff, | ) | Case No.: 4:13-cv-00047 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| OFFICER THOMPSON, | ) | By: Hon. Jackson L. Kiser |
| | ) | Senior United States District Judge |
| Defendant. | ) | |

On August 27, 2013, Plaintiff Michael Elder ("Elder") filed a *pro se* complaint against the City of Danville ("the City"), and Officer E. K. Thompson ("Thompson") of the Danville Police Department. The City moved to dismiss the complaint against it pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure; that motion was granted. (See Order, Dec. 12, 2013 [ECF No. 36].) Thompson, the only remaining defendant, moved for summary judgment on March 21, 2014. (Mot. for Summ. J., Mar. 21, 2014 [ECF No. 55].) The matter was fully briefed, and the parties appeared for oral argument on the Motion on April 17, 2014. Having considered the briefs and arguments of the parties, and after having reviewed the relevant portions of the Record, the matter is now ripe for disposition. For the reasons stated below, Thompson's Motion for Summary Judgment will be **GRANTED IN PART** and **DENIED IN PART**. Specifically, Thompson's summary judgment motion will be granted as to Elder's claims of false arrest and illegal search. Thompson's motion will be denied on Elder's claims of excessive force and deliberate indifference to a serious medical condition. Those claims will proceed to trial.

## STATEMENT OF FACTS AND PROCEDURAL BACKGROUND[1]

Defendant Officer E. K. Thompson is a Sergeant with the Danville Police Department. (See Def.'s Mem. in Supp. of Mot. for Summ. J. Ex. B pg. 1 [ECF No. 56-2] [hereinafter "Thompson Aff."].)   In that capacity, Thompson had occasion in the past to interact with Plaintiff Michael Elder, such that, on the date in question, he recognized Elder's name and face. (Id. pg. 1.)  Prior to the encounter at issue in this case, Thompson noticed what he assumed to be an arrest warrant for Michael Elder at the police station.  (Id.)  Generally, warrants and other court documents are placed in slots assigned to separate beats in the police station; the slots are commonly referred to as the "pigeon hole."  If a warrant is to be served in the geographic area that Beat 10 covers, for example, it is placed in Box 10.  According to Thompson, he had noticed a "jacket"—the outer cover of court documents—with Elder's name in the pigeon hole, and he assumed the document was a warrant for Elder's arrest. [2]  According to Elder, Thompson had attempted to serve the "warrant" several times before, including using the Fugitive Task Force to attempt to serve it.  (Pl.'s Br. in Opp. to Def.'s Mot. for Summ. J. pg. 11 [ECF No. 63].) Thompson admits that he had been by Elder's home looking for him several times.  (See Def.'s Mem. in Supp. of Mot. for Summ. J., March 21, 2014 [hereinafter "Def.'s Br."] Ex. E 20:14-16 [ECF No. 56-6].)  At no point, however, did Thompson ever open the jacket to read the warrant;

---

[1] Because Thompson's Motion for Summary Judgment is based on his assertion that he is protected by qualified immunity, the facts are viewed in the light most favorable to the party asserting the injury—Elder.  See Turmon v. Jordan, 405 F.3d 202, 204-05 (4th  Cir. 2005) (citing Saucier v. Katz, 533 U.S. 194, 201 (2001)).  Where Elder and Thompson's version of the facts differ, the version found in Elder's sworn affidavit is preferred.  (See Pl.'s Mem. in Opp. to Def.'s Mot. for Summ. J. Ex. A [ECF No. 64] [hereinafter "Elder Aff."].)

[2] Thompson admits that he never examined what he assumed to be a warrant for Elder's arrest.  As it turns out, the document Thompson had seen was *not* a warrant, but a show cause summons.  (See Am. Compl. Ex. A [ECF No. 18].)  Elder has provided records from Martinsville which state that the "Warrant Date" is "8/16/2011," the charge is "18.2-456," which is the Virginia criminal code section for summary contempt, and defines the circumstances as "Show Cause Summons."  (Id.)  Thompson's repeated reference to the "warrant," therefore, is inaccurate.

he merely read the cover, which included Elder's name, address, "Contempt of Court," and Martinsville as the issuing court. (See Def.'s Br. Ex. E 20:7–11.) What Thompson assumed to be a warrant was merely a summons.

On October 25, 2011, Thompson was on patrol in the area near Stonewall Apartments on North Main Street in Danville, Virginia. (Thompson Aff. pg. 1.) While there, Thompson encountered Elder "sitting in the driver's seat of a white four-door vehicle." (Id.) Thompson recognized Elder and recalled seeing a jacket with Elder's name on it in the pigeon hole. (Id.) Thompson approached the car and told Elder to step out of the vehicle; Elder complied. (Id.) According to Elder, Thompson approached the car in an aggressive manner and said, "I got your ass now." (Elder Aff. pg. 1.) Elder agrees that he was sitting in the car—which he asserts belonged to his wife—with his cousin, Michael. (Id.) Elder's sister, Janice Hairston, was sitting on the porch of a nearby apartment. (Id.) Thompson informed Elder that there was a warrant for his arrest. (See Elder Aff. pg. 1; Thompson Aff. pg. 1.) Elder insisted that the issue had been taken care of and that he had the paperwork to show that the issue had been resolved, but Thompson allegedly replied that he did not want to look at any paperwork. (Elder Aff. pg. 2.) Thompson then radioed police dispatch to verify Elder's outstanding warrant. (Elder Aff. pg. 2; Thompson Aff. pg. 1.) Thompson asked the dispatcher to run Elder's name "for locals"; after the dispatch confirmed that Thompson was seeking information regarding "Michael Ray Elder, date of birth 5/15/66," the system returned an automated "triple tone" which indicated to Thompson that the warrant search had returned an active warrant. (Def.'s Br. Ex. A; Thompson Aff. pg. 2). Thompson inquired into the nature of the warrant, asking, "What's it for?" (Def.'s Br. Ex. A.) The dispatcher responded that the warrant was for "FTA," which Thompson understood to mean failure to appear. (Id.)

Thompson claims he has served hundreds of warrants for failure to appear during his twelve years as a Danville police officer. (Thompson Aff. pg. 2.) He states that, to the best of his memory, every single failure to appear warrant has been in the form of a capias, which requires the arrest of the subject. (Id.) Ultimately, Thompson would discover that the Martinsville court did not issue a capias for Elder's arrest, but rather merely issued a show-cause summons that did *not* authorize or require Elder's arrest. (See Thompson Aff. pg. 3; Elder Aff. pg. 4.) At the time Thompson arrested Elder, however, he was under the impression that Elder's failure to appear was in the form of a capias, as the dispatcher had confirmed that a warrant existed.

According to Thompson, while he was speaking with the dispatcher, he observed Elder reach into his pockets. (Thompson Aff. pg. 2.) He allegedly told Elder to stop, and claims that Elder withdrew two objects from his pocket and tossed them through the open driver's-side window and into the back seat. (Id.) He also threw the paperwork from the Martinsville court into the back seat. (Id.) Thompson states that the two objects appeared to be folded currency. (Id.) Elder claims that he only threw the court paperwork into the car. (Elder Aff. pg. 2.)

Once the dispatcher confirmed the non-existent warrant, Thompson claims he informed Elder that he was under arrest. Thompson states that Elder refused to comply. (Thompson Aff. pg. 2.) Thompson admits he approached Elder, removed his pepper spray,[3] and warned Elder twice that, if he did not put his hands behind his back, Thompson would spray him. (Id.)

---

[3] The parties alternate between referring to "mace," "pepper spray," and "OC spray." "OC spray" refers to oleoresin capsicum spray, and is functionally equivalent to pepper spray. All of these terms refers to the chemical compound which was discharged into Elder's face.

Thompson contends that Elder complied only after the second warning, and Thompson thereafter placed the handcuffs on him without incident. (Id.)[4]

According to Elder, however, Thompson never warned him about the pepper spray and never asked him to submit to arrest. Elder states that, when he tossed the court paperwork into the car, "[O]fficer Thompson grabbed [his] left hand and told [him] to put [his] hands behind his back and that [he] was under arrest. [Elder] complied with the officer and handcuffs were placed on [him]." (Elder Aff. pg. 2.) Elder states that Thompson then "pushed [him] aggressively" towards Thompson's police cruiser, while Elder pleaded with Thompson to check the court paperwork. (Id.)

Thompson states that, once he maneuvered Elder to the police car and instructed Elder to get into the back, Elder began "passively resisting by stiffening up like a board and refusing to move or to allow [Thompson] to move him." (Thompson Aff. pg. 3.) Thompson continues:

> At this point, I once again withdrew my mace spray and warned Mr. Elder that if he refused to comply he would be sprayed. Mr. Elder continued to maintain a stiff and rigid posture and refused to obey my instruction. At that point, I used the mace spray. Mr. Elder still refused to get into the vehicle. Instead, he bent forward and I used a tactic which I had been taught in my training of four knee[-]nerve strikes before he finally complied with my instructions to enter the vehicle.

(Id.) According to John Combs, an individual whom Thompson has ofference as an expert witness,[5] a knee-nerve strike means that, "Thompson struck Elder on the side of his leg with his knee . . . ." (Def.'s Br. Ex. D, pg. 4.)

---

[4] Thompson states that another individual—Elder's cousin, Michael—was at the scene and in the car with Elder. Thompson states that Elder asked Michael to remove the paperwork from his car, but Thompson instructed him to back away from the car, and he complied. (Thompson Aff. pg. 2.)

[5] John Combs has not been designated an expert by this Court. Therefore, referring to him as such is improper, and presupposes that his qualifications will be satisfactory to the Court. *See* Fed. R. Evid. 702, 104(a).

Elder relays a very different version of events. Elder claims that, while Thompson was pushing Elder towards his cruiser, Thompson "open[ed] the door with his right hand and push[ed him] into the door of the police car." (Elder Aff. pg. 2.) Elder describes the rest of the encounter as follows:

> [I'm] still pleading with him to check the paperwork. As I'm pleading with [O]fficer Thompson to check the paperwork he sprays me with pepper spray then starts to hit me with his right forearm and elbow across the right side of my face and neck area. I couldn't see from that point on. I do know that I was struck in the right thigh area with something (through discovery I learned it was a metal rod that policemen use). I told the officer I couldn't get in the car with him pushing me against the car. He then stopped pushing and hitting me long enough to allow me room to get in the car.

(Elder Aff. pg. 2–3.) Once Elder was in the police cruiser, Thompson searched Elder's car.

Thompson states that the search of Elder's car was a "search incident to arrest." (Thompson Aff. pg. 3.) Thompson found two pieces of currency inside the car: one was lying on the rear passenger seat, and a second, folded bill was on the floorboard of the passenger's side of the car. (Id.) Thompson previously testified at a suppression hearing in state court that the manner in which the bill was folded—"folded up long ways and then half and then half again"—brought his attention to the bills. (Def.'s Br. Ex. E 23:24–25.) Thompson unfolded the bill and, inside, found an off-white rock that he later determined to be cocaine. (Thompson Aff. pg. 3.) Elder maintains that the money was not his. (See Elder Aff. pg. 3.)

Thompson then transported Elder to the police station. Once they arrived, "the warrant for failure to appear was determined to be a show cause summons. Mr. Elder was booked and placed in the jail for possession of cocaine charge." (Thompson Aff. pg. 3.) He was not booked for or charged with failure to appear.

Thompson's affidavit does not continue any further. Elder, however, states that Thompson continued to make threats to him on the ride to the police station. (Elder Aff. pg. 3.) Elder also repeatedly requested that Thompson "take [him] to get the pepper spray out [his] eye's [sic]." (Id.) Another officer asked Thompson what happened, and Elders says that Thompson "sarcastically responded[,] 'I had to gas him.'" (Id.) After he was patted down prior to booking, Elder was permitted to wipe "some" the pepper spray off of his face with a paper towel. (Id.) Elder claims that he again requested that the pepper spray be removed, "but [O]fficer Thompson ignore[d] [his] pleas." (Id.) After being booked and released on his own recognizance, Elder went to the hospital and had his injuries treated. (Elder Aff. pg. 4; Am. Compl. Ex. C.) Elder was treated for "bilateral pepper spray irritative conjunctivitis," "contusions/abrasions," and "HTN-exacerbation." (Am. Compl. Ex. C.)[6] He was referred to Dr. Robert Goodnight for a follow-up, and to Dr. Terry Odom to "recheck on pepper spray injury to eye." (Id.)

On August 27, 2013, Elder filed an *in forma pauperis* Complaint in this Court against Officer Thompson and the City of Danville ("the City"). I granted his motion seeking IFP status, and both Officer Thompson and the City were served. The City moved to dismiss the Complaint pursuant to Rule 12(b)(6); I granted that motion. Thompson filed an Answer asserting "qualified immunity" as an affirmative defense. (See Ans. ¶ 17 [ECF No. 26].) On March 21, Thompson moved for summary judgment, asserting that qualified immunity applies and that his arrest of Elder and subsequent physical encounter did not violate Elder's clearly established constitutional rights. (See Def.'s Br. pg. 7.) Elder responded with a written brief and a sworn and notarized affidavit recounting his version of the events. (See Pl.'s Br. in Opp. to Def.'s Mot. for Summ. J., April 4, 2014 [ECF No. 63] [hereinafter "Pl.'s Br."].) Thompson replied on April 11, 2014.

---

[6] Presumably, "HTN-exacerbation" refers to "hypertension exacerbation," meaning that a recent event has worsened Elder's pre-existing high blood pressure.

(Def.'s Reply to Pl.'s Resp. to Def.'s Mot. for Summ. J., April 11, 2014 [ECF No. 66].) The parties argued the Motion on April 17, 2014, and the matter is now ripe for decision.[7]

## STANDARD OF REVIEW

Summary judgment is appropriate where there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); George & Co. LLC v. Imagination Entm't Ltd., 575 F.3d 383, 392 (4th Cir. 2009). A genuine dispute of material fact exists "[w]here the record taken as a whole could . . . lead a rational trier of fact to find for the nonmoving party." Ricci v. DeStefano, 129 S. Ct. 2658, 2677 (2009) (internal quotation marks and citing reference omitted); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A genuine dispute cannot be found where there is only a scintilla of evidence favoring the nonmovant; rather, a court must look to the quantum of proof applicable to the claim to determine whether a genuine dispute exists. Scott v. Harris, 550 U.S. 372, 380 (2007); Anderson, 477 U.S. at 249–50, 254. A fact is material where it might affect the outcome of the case in light of the controlling law. Anderson, 477 U.S. at 248. On a motion for summary judgment, the facts are taken in the light most favorable to the non-moving party insofar as there is a genuine dispute about those facts. Scott, 550 U.S. at 380. At this stage, however, a court's role is not to weigh the evidence, but simply to determine whether a genuine dispute exists making it appropriate for the case to proceed to trial. Anderson, 477 U.S. at 249. It has been noted that "summary judgment is particularly appropriate . . . [w]here the unresolved issues are primarily legal rather than factual" in nature. Koehn v. Indian Hills Cmty. Coll., 371 F.3d 394, 396 (8th Cir. 2004).

---

[7] Elder filed a Reply to Thompson's Response on April 15, 2014. (See Pl.'s Reply to Def.'s Resp. for Summ. J., Apr. 15, 2014 [ECF No. 67].) Because that brief was in contravention of the pretrial Order entered in this case, and because Elder did not obtain leave of the Court for additional briefing, that brief was not considered.

The movant has the initial burden of pointing out to the court where the deficiency lies in the non-movants's case that would make it impossible for a reasonable fact-finder to bring a verdict in the non-movants's favor. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). A moving defendant may show that he is entitled to judgment as a matter of law by demonstrating that the plaintiff could not prove an essential element of his case. Id. at 322–23. It is then up to the plaintiff to demonstrate to the court that there are genuine issues of material fact and that he has made a sufficient showing on each of the essential elements of his case. Emmett v. Johnson, 532 F.3d 291, 297 (4th Cir. 2008); Hinkle v. City of Clarksburg, 81 F.3d 416, 421 (4th Cir. 1996). When the defendant provides affidavits and other materials with his motion for summary judgment, the plaintiff must respond with affidavits, deposition testimony, or as otherwise provided in Fed. R. Civ. P. 56(c). Celotex Corp., 477 U.S. at 324; Pension Ben. Guar. Corp. v. Beverley, 404 F.3d 243, 246 (4th Cir. 2005). Mere allegations, denials, references to the complaint, or oral argument is insufficient to rebut a defendant's motion which is supported by affidavits. Fed. R. Civ. P. 56(e)(2); Berckeley Inv. Group, Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006); Beverley, 404 F.3d at 246. "If the non-moving party has the burden of proof at trial, that party must set forth facts 'sufficient to establish the existence of an element essential to that party's case.'" Colkitt, 455 F.3d at 201 (quoting Celotrex Corp., 477 U.S. at 322).

## **DISCUSSION**

"Section 1983 of Title 42 creates a cause of action against any person who, acting under color of state law, abridges a right arising under the Constitution of the laws of the United States. Nevertheless, a government official sued under § 1983 is entitled to invoke qualified immunity, which is more than a mere defense to liability; it is immunity from suit itself." Cooper v. Sheehan, 735 F.3d 153, 158 (4th Cir. 2013) (citing Mitchell v. Forsyth, 472 U.S. 511, 526

(1985)). In addition to protecting officers whose conduct does not run afoul of the Constitution, "qualified immunity protects officers who commit constitutional violations but who, in light of clearly established law, could reasonably believe that their actions were lawful." Henry v. Purnell, 652 F.3d 524, 531 (4th Cir. 2011) (en banc).

When examining a claim of qualified immunity, the Court begins by "asking whether the facts, '[t]aken in the light most favorable to the [plaintiff],' show that 'the officer's conduct violated a constitutional right.' If the answer is no, 'that ends the matter, and the officer is entitled to immunity.'" Turmon v. Jordan, 405 F.3d 202, 204-05 (4th Cir. 2005) (quoting Saucier v. Katz, 533 U.S. 194, 201 (2001)). In determining whether a constitutional violation occurred, the facts are to be viewed in the light most favorable to the injured party—in this case, Michael Elder. See Turmon v. Jordan, 405 F.3d 202, 204-05 (4th Cir. 2005) (quoting Saucier, 533 U.S. at 201). "[I]f a violation could be made out on a favorable view of the parties' submissions, the next . . . step is to ask whether the right was clearly established" at the time of the violation. Saucier, 533 U.S. at 201; Turmon, 405 F.3d at 205. A constitutional right is "clearly established" when "its contours [are] sufficiently clear that a reasonable officer would understand that what he is doing violates that right." Hope v. Pelzer, 536 U.S. 730, 739 (2002). If the right is not "clearly established," the officer is entitled to immunity. See Sharp v. Johnson, 669 F.3d 144, 159 (3d Cir. 2012). When considering the two-step Saucier analysis, courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand." Pearson v. Callahan, 555 U.S. 223, 236 (2009).

In the present case, Elder alleges four distinct violations of his constitutional rights arising from his October 25, 2011, encounter with Thompson. First, Elder claims Thompson had

no cause to arrest him (false arrest). Next, he alleges Thompson used excessive force during the arrest (excessive force). Third, he claims Thompson did not have probable cause to search his vehicle (illegal search). Finally, he argues that Thompson's refusal to heed his requests for medical attention following Thompson's deployment of pepper spray was improper (deliberate indifference to a serious medical condition). Each claim is addressed in turn.

## I.    *False Arrest*

Elder first claims that, because no warrant actually existed for his arrest, Thompson's arrest of Elder violated Elder's rights. "In a § 1983 action based upon a violation of the [F]ourth [A]mendment, it is not sufficient to establish that an arrest warrant was 'defective' . . . . Rather, the qualified immunity defense will shield the defendant from liability unless the record demonstrates that the defendant had no reasonable good faith belief in the legality of the seizure." Lowrance v. Pflueger, 878 F.2d 1014, 1017 (7th Cir. 1989) (citing Donald v. Polk Cnty., 836 F.2d 376, 384 (7th Cir. 1988)). Therefore, even though Elder is correct that there was no legal basis for his arrest, he must carry the burden of establishing that Thompson had no reasonable basis for his reliance on the "warrant."

Elder argues that Thompson's reliance on the dispatcher's warrant confirmation that is insufficient for several reasons. First, Thompson had attempted to serve the warrant previously without ever actually reading it. Second, Thompson did not have the warrant "faxed" to him during his radio call with the dispatcher. Finally, Elder contends that his protestations regarding the status of the warrant should have superseded the dispatcher's confirmation that a warrant was outstanding.

Each of these arguments must fail. First, Thompson was not relying on a warrant he had not read to justify his arrest of Elder; rather, he was relying on a warrant he had not read to

justify *confirming with the dispatcher that a warrant existed*.[8]  Second, there is no requirement

that, following double confirmation from the dispatcher that an arrest warrant was outstanding

(the triple tone and a voice confirmation), Thompson is required to view the warrant itself.

Finally, requiring a police officer to heed a suspect's protestations that an arrest is wrongful

would drastically alter the criminal justice landscape.  In such a situation, an officer is reasonable

in assuming either the suspect is misleading him, or the suspect is mistaken regarding the more

intricate aspects of the law.  Once Thompson received verbal confirmation that a warrant was

outstanding—even though that confirmation was demonstrably wrong—Thompson had a

"reasonable good faith belief in the legality of the seizure."  Lowrance, 878 F.2d at 1017.  For

this reason Thompson is entitled to qualified immunity, and summary judgment on the false

arrest claim is appropriate.  Accord Knoche v. Wheatley, Case No. 94-2378, 1995 WL 759463,

at *3 (7th Cir. Dec. 20, 1995) (unpublished) (affording officer qualified immunity after he

received confirmation from a dispatcher and from NCIC that a warrant was outstanding, even

though no warrant existed, and granting summary judgment).

## II.    *Excessive Force*

Elder next claims that Thompson used excessive force in effecting his arrest.  At the

outset, it is important to note the authority under which Elder may assert a claim for excessive

force.  The Supreme Court has rejected claims to a "generic" right to be free from excessive

force during an arrest.  See Graham v. Connor, 490 U.S. 386, 393–94 (1989).  Thompson

contends that Elder's claim may arise under either the Fourth or Eighth Amendments, but that is

---

[8] This is not to say that Elder's allegation that Thompson attempted to serve a warrant with the Fugitive
Task Force Team without reading it is not constitutionally suspect; it certainly is.  Rather, because the
warrant was not served at that point, it is not actionable in this case.

not accurate.[9] "Where, as here, the excessive force claim arises in the context of an arrest or investigatory stop of a free citizen, it is most properly characterized as one invoking the protections of the Fourth Amendment, which guarantees citizens the right 'to be secure in their persons . . . against unreasonable . . . seizures' of the person." Id. at 394. "After conviction, the Eighth Amendment 'serves as the primary source of substantive protection . . . in cases . . . where the deliberate use of force is challenged as excessive and unjustified.'" Id. at 395 n.10 (quoting Whitley v. Albers, 475 U.S. 312, 327 (1986)).

Utilizing the Saucier analysis for determining whether Thompson is entitled to qualified immunity, it is beyond question that Elder had a constitutional right to be free from excessive force during his arrest. See Graham, 490 U.S. at 394. This mandate must be countered, however, with the equally clear recognition "that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." Id. at 396. In order to balance these two competing interests, the Supreme Court has declared that claims of excessive force under the Fourth Amendment must be analyzed under a standard of "objective reasonableness." See id. at 397. "[T]he 'reasonableness' inquiry in an excessive force claim is an objective one: the question is whether the officer['s] actions are 'objectively reasonable' in light of the facts and circumstances confronting [him], without regard to [his] underlying intent or motivation." Id.

When assessing whether an officer's actions are reasonable, courts weigh "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the

---

[9] This distinction is important because the standards under which the force is examined vary based on the source of the substantive right in question. Compare Whitley, Whitley v. Albers, 475 U.S. 312, 320 (1986) (setting standard for excessive force claims under the Eighth Amendment as inflicting "unnecessary and wanton pain and suffering"), with Graham, 490 U.S. at 397 (setting standard for excessive force claims under the Fourth Amendment as an objective test of reasonableness "in light of the facts and circumstances" facing the officer).

countervailing governmental interests at stake." <u>Id.</u> at 396. "The nature of the intrusion on a plaintiff's Fourth Amendment rights is generally measured by 'the amount of force employed to affect the seizure.'" <u>Turmon</u>, 405 F.3d at 207 (quoting <u>Howerton v. Fletcher</u>, 213 F.3d 171, 173 (4th Cir. 2000)). Determining the governmental interests at stake "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." <u>Graham</u>, 490 U.S. at 396; <u>see also</u> <u>Tennessee v. Garner</u>, 471 U.S. 1, 8-9 (1985) (noting that the question is "whether the totality of the circumstances justifie[s] a particular sort of . . . seizure."). In analyzing these factors, the court must view the facts in the light most favorable to the injured party, meaning I must take the facts as Elder has properly alleged them. <u>See, e.g.</u>, <u>Turmon</u>, 405 F.3d at 207 ("The facts, taken in the light most favorable to Turmon . . . .").

The facts as alleged by Elder are that, after he was handcuffed, Thompson slammed him into the door of his police cruiser. While Elder was standing next to Thompson's cruiser, Thompson pepper sprayed him multiple times, hit him in the face and on the neck multiple times, and used a metal rod to hit him in the knee and/or thigh on multiple occasions. Assuming that level of force, the next step is to consider the "totality of the circumstances," <u>Garner</u>, 471 U.S. at 8−9, and determine what the governmental interests at stake was, in light of the factors set forth in <u>Graham</u>.

First, Elder was being arrested for failure to appear; it must be conceded, then, that the "severity of [the] crime at issue" was relatively minor. <u>See</u> <u>Graham</u>, 490 U.S. at 396. While it is important that courts have the authority and power to compel compliance with its orders, and

while that power is important for the orderly administration of justice, other offenses would qualify as much more serious.

Second, Elder did not pose an "immediate threat to the safety of the officer [] or others . . . ." Id. In fact, according to Elder, he was not resisting Thompson at all; rather, he was pleading with him to look at the papers from the Martinsville court which, presumably, would have showed that the "warrant" did not exist. (Elder Aff. pg. 2.) Moreover, even if I accept Thompson's version of the facts, Elder was only "passively resisting" by "stiffening up like a board." (Thompson Aff. pg. 3.) He was not forcibly resisting the arrest, thrashing about, or doing anything that could have resulted in injury or danger to Thompson, let alone either of the other two people present. At most, if Elder was "stiffening up like a board," he was causing a minor inconvenience to Thompson by "refusing to allow [Thompson] to move him." (Thompson Aff. pg. 3.)

Finally, Elder was not "actively resisting arrest or attempting to evade arrest by flight." Graham, 490 U.S. at 396. At the time Thompson slammed Elder into the cruiser door and deployed pepper spray, knee-nerve strikes, and the blows to Elder's head (see Elder Aff. pg. 2−3), Elder was in custody and standing passively by the police cruiser. Again, even accepting Thompson's version of the facts, Thompson does not contend that Elder was "actively resisting arrest." [10] See Graham, 490 U.S. at 396. Given the "totality of the circumstances," Garner, 471 U.S. at 8−9, it is difficult to conclude that, based on Elder's version of the events, Thompson was acting within the bounds of a reasonable officer under the circumstances. Thus, it is clear based

---

[10] Thompson states in several places that Elder was only passively resisting. (See, e.g., Thompson Aff. pg. 3.) John Combs, however, makes the unsubstantiated assertion that Elder actively resisted arrest. (See Def.'s Br. Ex. D. pg. 5 ("Even when Elder was subsequently handcuffed, he continued to actively resist the officer's efforts to control him and continued to pose a safety risk if he was able to escape the officer's control.").) Because the decision of whether qualified immunity applies is a purely legal question, see Willingham v. Crooke, 412 F.3d 553, 555 (4th Cir. 2005), Combs's opinion is not relevant at this stage and will not be considered.

on the facts Elder alleges that Thompson's actions would have violated Elder's Fourth Amendment right to be free from an "unreasonable seizure." The next step is to determine if a reasonable officer in Thompson's place would have understood that the events Elder describes were illegal.

"It is clearly established that 'the use of force is contrary to the Fourth Amendment if it is excessive under objective standards of reasonableness.'" Lyles v. Burke, Case No. 06-cv-01604, 2008 WL 140466, at *5 (D. Colo. Jan. 10, 2008) (quoting Saucier v. Katz, 533 U.S. 194, 201−02 (2001)). "Such a generalized establishment of a right, however, is not sufficient for purposes of qualified immunity analysis." Id. "The right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense: [t]he contours of the right must be sufficiently clear that a reasonable officer would understand that what he is doing violates that right." Saucier, 533 U.S. at 201−02. In order to complete the inquiry, therefore, I must determine whether the contours of the right in question—the right to be free from excessive force when handcuffed and not resisting arrest—were sufficiently clear such that a reasonable officer in Thompson's place would have understood that the deployment of pepper spray, knee-nerve strikes, and blows with the "right forearm and elbow across the right side of [the] face and neck" (Elder Aff. pg. 2) would violate the Fourth Amendment. See Hope v. Pelzer, 536 U.S. 730, 739 (2002).

Case law may be instructive on this point. While "[e]xact factual identity with a previously decided case is not required, [] the unlawfulness of the conduct must be apparent from pre-existing law." Coffin v. Brandau, 642 F.3d 999, 1013 (11th Cir. 2011); see also United States v. Lanier, 520 U.S. 259, 269 (1997) ("[W]e have upheld convictions . . . despite notable factual distinctions between the precedents relied on and the cases then before the Court, so long

as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights."); Anderson v. Creighton, 483 U.S. 635, 640 (1987) ("This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in light of pre-existing law the unlawfulness must be apparent." (internal citations omitted)).  "The critical inquiry is whether the law provided [Thompson] with 'fair warning' that [his] conduct violated the Fourth Amendment." McClish v. Nugent, 483 F.3d 1231, 1248 (11th Cir. 2007) (quoting Hope v. Pelzer, 536 U.S. 730, 741 (2002)).

One published decision from the Seventh Circuit is particularly germane.  The facts of Rambo v. Daley, 68 F.3d 203 (7th Cir. 1995), closely align with those facts alleged by Elder.  On April 5, 1991, Officer John Daley was patrolling Burnham, Illinois, when he encountered a car driven by Harvey Rambo.  Id. at 205.  Despite the fact that Rambo was driving normally, Daley followed Rambo across the state line and into Indiana.  Id.  When Rambo pulled into a parking lot, Daley followed.  Id.  Daley left his car, approached Rambo, and asked to see his license.  Id. Rambo replied that, because he was in Indiana, he would only comply with instructions from Indiana police.  Id.  Another Illinois officer arrived, and the officers arrested Rambo and placed him in handcuffs.  Id.  "Rambo refused to enter [Daley's] squad car, protesting that Daley and McGinnis lacked authority in Indiana."  Id.  Rambo demanded that Daley request local police assistance.  Id.  "Rambo maintain[ed] that, in response to his request, one officer punched him, thereby fracturing his ribs, while the other officer pulled him into the squad car by his hair.  At no time during the arrest did Rambo attempt to flee or become physically aggressive towards the Burnham police officers."  Id.

On appeal challenging the district court's denial of summary judgment, based on the decision that the officers were not entitled to qualified immunity, the Seventh Circuit concluded:

> The defendants do not contend, nor could they, that under the plaintiff's version of the facts their actions could be considered objectively reasonable. The Constitution clearly does not allow police officers to force a handcuffed, passive suspect into a squad car by breaking his ribs. According to Rambo, he did not attempt to flee or physically resist Daley and McGinnis. Rambo merely asked the Illinois police officers, who were outside of their jurisdiction, to call for Indiana assistance. In response, Daley and McGinnis punched Rambo hard enough to fracture two of his ribs and pulled Rambo into the squad car by his hair. These actions were clearly not objectively reasonable under the Fourth Amendment's Graham standard. No reasonable officer could have believed that the force used by the defendants was lawful.

Id. at 207. Daley's appeal was ultimately dismissed. Id.

The similarities to the present case are striking. Rambo was a non-resisting offender arrested for a driving under the influence.[11] Id. at 205. He did not pose any risk to the officers or to anyone else around him. The only reason offered for his refusal to get into the police car was that he was asking the officers to undertake a simple task. In response, the officers struck him and forced him into the car. Likewise, Elder was a non-resisting offender being arrested on an outstanding warrant for failure to appear. He posed no threat, was not actively resisting, and had not attempted to flee. His reason for failing to get into the car is that he was asking Thompson to look at a piece of paper. In response, Thompson pepper-sprayed him, struck him in the face and neck, and hit him with a metal rod (presumably Thompson's baton).

The primary difference between Rambo's case and Elder's is that Rambo suffered a broken rib, whereas Elder's injuries were limited to a contusion (presumably on his face, though

---

[11] Although Rambo was charged with resisting arrest, the court was bound by Rambo's version of the facts when deciding whether the officers were entitled to qualified immunity. Rambo stated that he "did not attempt to flee or physically resist Daley and McGinnis," the arresting officers. Rambo, 68 F>3d at 207.

Elder does not specify) and conjunctivitis from the pepper spray. While "the lack of serious physical injury is not, in itself, dispositive of a Fourth Amendment excessive force claim, the 'absence of [a] serious injury' nevertheless remains relevant in an excessive force inquiry." McMillian v. LeConey, Case No. 5:09-cv-175, 2011 WL 2144628, at *10 (E.D.N.C. May 21, 2011) (quoting Wilkins v. Gaddy, 559 U.S. 34, 37 (2010)). One "does not lose his ability to pursue an excessive force claim merely because he had the good fortune to escape without serious injury." Wilkins, 559 U.S. at 38. "That does not mean the extent of a person's injuries is irrelevant, however. The lack, or minor degree of an injury, remains relevant in determining the reasonableness of the force used. This is true because the less serious the injury, the more likely the amount of force used was reasonable." Green v. Missouri, 734 F. Supp. 2d 814, 838 (E.D. Mo. 2010) (citing Greiner v. City of Champlin, 27 F.3d 1346, 1355 (8th Cir. 1994)).

The relatively minor severity of Elder's injuries would certainly weigh in favor of the reasonableness of Thompson's actions. In that regard, the case Elder cites—Martinez v. New Mexico Department of Public Safety—offers some guidance. In that case, a trooper pulled over Mary Martinez for speeding and discovered that she had an outstanding warrant for failure to appear. 47 F. App'x 513, 514 (10th Cir. 2002) (unpublished). The trooper arrested Martinez, and she refused to get into his police cruiser until the trooper produced identification. Id. at 515. When she persisted in her refusal, the trooper pepper-sprayed her in the face. Id. She did not suffer any lasting injury, as the only use of force was the pepper spray. See id. In denying qualified immunity to the officer, the Tenth Circuit held that:

> Trooper Boyd's actions in this case meet [the standard that no reasonable officer could have believed that his actions were legal]. Plaintiff was under arrest, was handcuffed, and was standing beside the police cruiser. She was refusing to enter the cruiser because she wanted to see his identification. Trooper Boyd could have defused the situation by showing her the identification or by

> waiting for additional back-up to help persuade plaintiff to get into
> the cruiser. The fact that the use of mace in this situation was
> excessive would have been clear to a reasonable officer.

Id. at 517 (citing LaLonde v. County of Riverside, 204 F.3d 947, 961 (9th Cir. 2000) (noting it would be clear to a reasonable officer that use of pepper spray was excessive where arrestee was under control, had surrendered, and was rendered helpless)). Just as in Martinez, Thompson had any number of options to defuse the situation without the immediate resort to force.[12]

Thompson argues that Martinez is inapposite because, while Martinez's resistance was merely verbal, Elder "presented a potentially dangerous situation to Officer Thompson, one which he used the appropriate amount of force to control." (Def.'s Br. pg. 5.) Thompson makes this assertion without identifying a single fact to justify the conclusion that Elder presented a dangerous situation. Moreover, the argument ignores the standard on summary judgment and the standard for reviewing claims of qualified immunity—specifically, that the facts are taken in the light most favorable to Elder. According to Elder, his resistance *was* only verbal. Thus, at this stage, Martinez is perfectly analogous.

Thompson is correct, however, that Martinez is an unpublished decision from a separate circuit, and therefore is not binding precedent. A published opinion from the Fourth Circuit, however, confirms the conclusion in Martinez. In Park v. Shiftlett, a husband and wife accidentally set off the burglar alarm at a convenience store when they attempted to open the door to the store, not realizing that the business had closed. 250 F.3d 843, 848 (4th Cir. 2001). They called 911 and agreed to wait at the store until officers arrived. Id. When the police came, the encounter took longer than expected and the Parks became concerned that a pressure cooker

---

[12] To be sure, "[t]he Fourth Amendment does not require an arresting officer to first ask for voluntary submission to arrest where such officer is faced with an arrestee he believes to be potentially armed and dangerous and who has recently committed a serious offense." Givens, 2012 WL 706122, at *8. There is no evidence to suggest, however, that Elder posed any such threat. Not even Thompson has testified that he had any reason to believe that Elder was a threat, was armed, or was dangerous.

they had left on in their home posed a potential fire risk.  Id.  They asked if they could leave; the officers on the scene said no.  Id.  When Mr. Park went to leave, the officers placed him in handcuffs and pushed him against a wall.  Id.  "At no time did Mr. Park physically resist arrest, nor did he ever verbally or physically threaten the officers."  Id.  When Mrs. Park ran to her husband's aid, officers handcuffed her and pepper-sprayed her twice at close range.  Id.

Following a bench trial, the court awarded Mrs. Parks $450,000.00, and awarded Mr. Parks $50,000.00.  On appeal, the Fourth Circuit affirmed the verdict and stated:

> It is difficult to imagine the unarmed Mrs. Park as a threat to the officers or the public. . . . When the trial judge did [the requisite] balancing, after listening to extensive testimony from all the parties, he was determined that the force used by the officers was unreasonable and excessive.  The questions that should be asked are whether or not reasonable police officers, acting under the same or similar circumstances, would have twice, from close range, sprayed Mrs. Park with OC, and would they have handcuffed and arrested the Parks after throwing them against the wall and on the ground?  This court does not think so.

Id. at 853.  The Fourth Circuit ultimately reduced Mrs. Park's award to $300,000.00, and reduced Mr. Park's award to $1.00.  See id. at 853−54.

In the present case, Elder alleges that Thompson pepper-sprayed him multiple times from close range while Elder was handcuffed.  At the time, Elder had not resisted in any meaningful sense of the word.  According to his version of events, the only instruction he failed to heed was Thompson's first command to place his hands behind his back.  Under Park and the facts Elder alleges, Thompson's use of force was excessive.

The Southern District of Iowa has stated, "[p]epper spray has most often been found to amount to excessive force when its use is gratuitous or clearly unnecessary . . . ."  Davis v. City of Albia, 434 F. Supp. 2d 692, 707 (S.D. Iowa 2006).  The court cited both Martinez and a Ninth Circuit case to conclude that force was excessive where "the plaintiffs were under control of law

enforcement officers and there were no 'tense, uncertain or rapidly evolving circumstances with which the officers had to contend." Id. (quoting Headwaters Forest Defense v. County of Humboldt, 276 F.3d 1125, 1130 (9th Cir. 2002)). The circumstances surrounding Thompson's use of force against Elder align neatly with those presented to these courts.

Thsee facts, when taken in the light most favorable to Elder, indicate that Thompson's actions would have violated Elder's right to be free from an "unreasonable . . . seizure" under the Fourth Amendment. The "contours" of that right were sufficiently clear at the time of Elder's arrest that a reasonable officer would have known that pepper-spraying, striking, and hitting a non-resisting, passive suspect in the face, neck, and legs would violate that right. Accordingly, Thompson is not entitled to qualified immunity with respect to Elder's claim of excessive force, and his motion for summary judgment on that claim will be denied.

**III.** *Illegal Search*

Elder next contends that Thompson's search of Elder's automobile, while Elder was handcuffed in the back of Thompson's cruiser, amounts to an unconstitutional search. In the same manner as Elder's excessive force claim, Thompson's qualified immunity defense is reviewed under the two-part Saucier analysis. In Anderson v. Creighton, the Supreme Court held that a person is entitled to summary judgment based on qualified immunity if he can establish that "a reasonable officer could have believed that the search comported with the Fourth Amendment," Anderson v. Creighton, 483 U.S. 635, 636–37 (1987), even if the search was unreasonable under the Fourth Amendment. "The relevant question . . . is the objective (albeit fact-specific) question whether a reasonable officer could have believed [Thompson's] warrantless search to be lawful, in light of clearly established law and the information the

searching officer[] possessed.  [Thompson's] subjective beliefs about the search are irrelevant." Id. at 641.

According to Elder, while Thompson was on the radio with the dispatcher, Elder threw the paperwork from the Martinsville court through the open window of the driver's side front door into the back seat.  At that point, Thompson arrested him, placed him in handcuffs, and placed Elder in the back of the police cruiser.  Thompson then searched the back seat of Elder's car, and opened a small package (a dollar bill folded in on itself) and discovered cocaine.

Thompson testified that the search of Elder's car was a search incident to arrest.  (See Thompson Aff. pg. 3.)  Under prevailing law, it is clear that, unless some other exception to the Fourth Amendment warrant requirement applies, a search incident to arrest when the suspect is not within reaching distance of his automobile generally violates the Fourth Amendment.  See Arizona v. Grant, 556 U.S. 332, 335 (2009) ("[W]e hold that [New York v.] Belton does not authorize a vehicle search incident to a recent occupant's arrest after the arrestee has been secured and cannot access the interior of the vehicle.").

Arizona v. Gant permits a search of an automobile without a warrant following an arrest in two instances.  The first—"when the arrestee is unsecured and within reaching distance of the passenger compartment at the time of the search"—is clearly inapplicable.  Gant, 556 U.S. at 343.  The second exception, however—"when it is 'reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle"—*is* implicated and, under the facts Elder presents, justified the search of Elder's automobile.  See id. (quoting Thornton v. United States, 541 U.S. 615, 632 (2004)). Elder was being arrested for failure to appear, and he admits that the papers he threw into the car related to that charge.  Thus, Thompson was reasonable in believing that "evidence of the crime of arrest"—specifically, the papers Elder identified as court

documents relating to the failure to appear charge—would be found in the car. Therefore, the search of the automobile was permissible.[13]

While it is true that the papers were relevant to Elder's charge, a search to retrieve those papers would not have extended as far as opening the folded dollar bill.[14] During the warrantless search of an automobile, officers are typically limited to searching only those areas in which it is reasonable to assume that the object or objects for which they are searching may be found. See United States v. Ross, 456 U.S. 798, 824 (1982) ("The scope of a warrantless search of an automobile . . . is defined by the object of the search and the places in which there is probable cause to believe that it may be found."). Thus, under the limitations of Ross, even if Thompson had probable cause to search the vehicle, he did not have probable cause to search where the court papers could not have been found. The contents of a folded dollar bill did not have any relation to the "crime of arrest," and were outside the scope of authority Thompson had to search the car.[15]

---

[13] I pause to note that this conclusion relies almost exclusively on Elder's admission that he had identified the documents to Thompson prior to the search, and that Thompson saw Elder place those documents in the car. If Elder had not identified the documents, I believe it would be extremely unlikely for an officer to reasonably believe that evidence relevant to the crime of arrest—failure to appear—would be found in the car. Under almost any other factual scenario involving an arrest for failure to appear, the Gant exception at issue would likely be inapplicable.

[14] For this analysis, I find that the folded dollar bill was a "container" for Fourth Amendment purposes, and the reasoning of United States v. Ross, 456 U.S. 798, 824 (1982), applies with equal force. Just like a glove box or suitcase, the folded dollar bill was designed to secret something from view and, unless independent probable cause existed to open the dollar bill, examining its contents was a search under the Fourth Amendment.

[15] According to Elder, Thompson merely came across the folded dollar bill in the car. A folded bill, by itself, is not probable cause sufficient to justify a search. See Grandison v. Virginia, 274 Va. 316, 321 (2007) ("[T]he folded dollar bill was legal material with a legitimate purpose, even though [the] [o]fficer . . . knew that dollar bills folded in a similar manner are often used as containers for drugs. No other circumstances indicated criminal activity. . . . [W]e conclude that, in the present case, [the] [o]fficer . . . did not have probable cause to retrieve the dollar bill from Grandison's possession."). Unlike the present case, Grandison concerned a "pat-down search" during a traffic stop, whereupon the officer discovered a folded dollar bill in a suspect's pocket. See id. at 318−19. There was no independent probable cause for

Elder's position with the regard to the dollar bill, however, forecloses a finding that a constitutional violation occurred. Throughout this case and the state court case, he has vehemently disclaimed any ownership in the folded dollar bill. For example, in his affidavit, Elder clearly states that he "didn't have no dope or money." (Elder Aff. pg. 3.) Elder cannot claim an expectation of privacy in an object that he claims was not his and that he did not know existed. Because "[t]he touchstone of Fourth Amendment analysis is whether a person has a 'constitutionally protected reasonable expectation of privacy,'" California v. Ciraolo, 476 U.S. 307, 312 (1986) (quoting Katz v. United States, 389 U.S. 347, 360 (1967) (Harlan, J., concurring)), Elder cannot assert that his constitutional rights were violated by the search of the dollar bill. Either the bill was his and he had an expectation of privacy, or the bill did not belong to him, in which case he cannot contend that the search violated his rights. He cannot have it both ways.

Because he asserts the bill was not his, he cannot claim that he had an expectation that the contents of the bill would remain private, and thus no violation of *his* constitutional rights would have occurred when Thompson opened and searched the bill. Under the Saucier analysis, the search of the car and the dollar bills did not violate Elder's constitutional rights. Therefore, Thompson is entitled to qualified immunity with respect to the unlawful search claim, and summary judgment must be granted accordingly.

---

the search in Grandison. Here, however, as noted above, the search of the car was permissible because it was reasonable for the officer to believe that evidence relevant to the crime of the arrest would be discovered in the car. Thus, the dollar bill was "in plain view of an officer who has a right to be in the position to have that view," Harris v. United States, 390 U.S. 234, 236 (1968). While I conclude that Elder does not have the requisite standing to assert a constitutional injury flowing from the "search" of the folded dollar bill, I believe the present case is distinguishable from Grandison.

## IV.    *Deliberate Indifference to a Serious Medical Condition*

Elder's final claim is that Thompson was deliberately indifferent to a serious medical condition, specifically the aftereffects of the pepper spray.  This claim is quite different because references to it in the Complaint and Amended Complaint are scarce.[16]  For example, Elder claims that he "asked for medical treatment and [Thompson] denied it."  (Compl. ¶ 3 [ECF No. 3].)  He states that Thompson "got away . . . without taking [Elder] to the hospital for decontamination."  (Compl. ¶ 6.)  He also states, "Officer Thomason [sic] should have known that if a suspect is pepper-sprayed and struck multiple times . . . medical care should have been rendered."  (Am. Compl. ¶ 5 [ECF No. 18].)  There are no other references to Thompson's refusal to take Elder to receive medical attention in his pleadings.  Elder does, however, make repeated statements regarding the refusal in his affidavit.[17]

Insofar as a claim is alleged, the claim is theoretically viable.  "Claims of deliberate indifference to a serious medical need during an arrest are covered by the due process clause."  Thomas v. Kincaid, Case No. 03-941, 2004 WL 3321472, at *5 (E.D. Va. June 30, 2004) (citing Bell v. Wolfish, 441 U.S. 520, 525 n.16 (1979)).  "[U]nder the Due Process Clause, a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law."  Bell, 441 U.S. at 525.  "[T]o establish that inadequate medical treatment rises to the level of a constitutional violation, a plaintiff 'must allege acts or omissions sufficiently harmful to evidence a deliberate indifference to serious medical needs.'"  Thomas, 2004 WL 3321472, at *5

---

[16]  Pursuant to an Order entered on October 22, 2013, the Complaint and Amended Complaint are combined and the allegations in *both* serve as the basis for this lawsuit.  (See Order, Oct. 22, 2013 [ECF No. 19].)

[17]  See, e.g., Elder Aff. pg. 3 ("I'm steadily telling him to take me to get the pepper spray out my eye's [sic].").  In his brief in opposition to summary judgment, Elder lists "[f]ailure to [p]rovide [m]edical [t]reatment to and [sic] injured person in police custody."  (Pl.'s Br. pg. 12.)  While Elder's assertion amount to the bare minimum of pleading requirement, I believe Elder raised the issue sufficiently to make out a claim.

- 26 -

(quoting <u>Estelle v. Gamble</u>, 429 U.S. 97, 105 (1976)). A plaintiff must allege two elements to state such a claim. "First, he must demonstrate a sufficiently serious medical need. . . . [Second, he] must also show deliberate indifference to that need. For this second prong, an assertion of mere negligence or malpractice is not enough to constitute a[] constitutional violation." <u>Id.</u> (citing <u>Brice v. Va. Beach Corr. Ctr.</u>, 58 F.3d 101, 10405 (4th Cir. 1995)). "[T]he plaintiff must demonstrate that defendants' actions were '[s]o grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness.'" <u>Id.</u> (quoting <u>Miltier v. Beorn</u>, 896 F.2d 848, 851 (4th Cir. 1990)).

Thompson, however, did not address this claim in his brief, and has therefore failed to move for summary judgment on this issue. Given that Elder had no notice that this claim may be considered on summary judgment, and considering his status as *pro se*, I do not believe that this claim may be disposed of at this stage. <u>Accord</u> <u>Hope for Families & Comm. Serv., Inc. v. Warren</u>, 721 F. Supp. 2d 1079, 1180 (M.D. Ala. 2010) ("Because the claim . . . was not addressed in Defendant's opening summary judgment brief, it could be found that Defendant[] did not discharge [his] initial burden of informing the court of the basis for [his] motion and demonstrating the absence of a genuine issue of material fact . . . .").

Nevertheless, Thompson did attempt to address the claim in his Reply. (See Def.'s Reply, pg. 67.) Thompson argues that "Plaintiff's bare assertion that he required medical care and that Officer Thompson failed to provide it, without more, is insufficient as a matter of law to create a dispute of material fact sufficient to overcome qualified immunity at the summary judgment stage." (Def.'s Reply, pg. 7.) This argument, however, misrepresents the standard of summary judgment. It is not Elder's responsibility to come forward with evidence of a material factual dispute on an element Thompson ignored in his opening brief. If there is not a genuine

dispute of material fact, it is Thompson's responsibility to point it out and move for summary judgment on the issue. Elder is not required to show that Thompson is not entitled to summary judgment when Thompson has not asked that judgment be granted in his favor.

Finally, Thompson incorrectly claims that Elder has not presented any evidence of his injury, nor has he shown any proximate cause connecting his injuries to Thompson's use of force. To the contrary, in his Amended Complaint, Elder presented discharge papers from a physician diagnosing him with "bilateral pepper spray irritative conjunctivitis," "contusions/abrasions," and "HTN-exacerbation." (Am. Compl. Ex. C.) Additionally, Elder was referred to Dr. Robert Goodnight for a follow-up, and to Dr. Terry Odom to "recheck on pepper spray injury to eye." (Id.) Clearly there is evidence in the Record to establish that Elder suffered an injury, and that a physician concluded that the injury was caused by exposure to pepper spray.[18] The fact that the diagnosis came only hours after Thompson deployed pepper spray in Elder's face is clear evidence of proximate causation. Therefore, Thompson is not entitled to summary judgment on this claim.

## CONCLUSION

Thompson is entitled to qualified immunity on Elder's claim of false arrest because Thompson had a reasonable, good-faith belief that a warrant existed for Elder's arrest. Under the

---

[18] Summary judgment may be defeated by reliance on any evidence in the record, not merely by reliance on that evidence presented with the motion for summary judgment. See Fed. R. Civ. P. 56(c)(1)(a) ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials . . . ."); Simpson v. Specialty Retail Concepts, Inc., 908 F. Supp. 323, 326 (M.D.N.C. 1995) ("The party opposing the motion for summary judgment may not merely rest on its pleadings, *but must provide evidence or point to evidence already in the record*, properly authenticated pursuant to Rule 56(e), that would be sufficient to support a jury verdict in its favor." (emphasis added)).

facts, I cannot say that a reasonable officer would have believed that the arrest of Elder was unlawful.

The search of Elder's car was a lawful search incident to arrest, Thompson is protected by qualified immunity, and he is entitled to summary judgment on that claim. Likewise, Elder's claim that Thompson's search of the folded dollar bill was illegal is without merit. Elder asserts that the dollar bill was not his. Because Elder cannot have a reasonable expectation of privacy in property that is not his, he cannot assert that his constitutional rights were violated. Summary judgment will be granted on the claim of illegal search.

Under the facts alleged by Elder, Thompson's use of force was excessive, and a reasonable officer would have understood that the amount of force Elder's alleges was unlawful. As such, Thompson is not entitled to qualified immunity on Elder's excessive force claim, and summary judgment will be denied.

Finally, Elder's claim of deliberate indifference to a serious medical condition is not proper for consideration. That claim must also proceed to trial.

The Clerk is directed to forward a copy of this Memorandum Opinion to all counsel of record and to Mr. Elder.

Entered this 22nd day of April, 2014.


s/Jackson L. Kiser
SENIOR UNITED STATES DISTRICT JUDGE